**Daniel HENRY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4563.**

Supreme Court of Alaska.

Oct. 10, 1980.

Joseph W. Evans, Birch, Horton, Bittner & Monroe, Anchorage, for appellant.

Joseph D. Balfe, Dist. Atty., Anchorage, W. H. Hawley, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.*

OPINION

MATTHEWS, Justice.

On this appeal of his burglary conviction, Daniel Henry challenges the procedures by which the police obtained his fingerprints. He contends first that he was illegally detained without probable cause, so that the fingerprints must be suppressed, and second that if his detention was legal his consent to fingerprinting was tainted, because he was not advised of his right to refuse consent.

On the evening of August 3, 1978, a home in Anchorage was burglarized. The police obtained a set of fingerprints of the suspected burglar. Two persons living near the burglarized house observed a suspicious car, which turned out to belong to Henry. The police therefore issued a "locate" bulletin on him.

On August 30, Anchorage police officer Ronald Smith was on routine patrol duty when he saw Henry. Smith earlier that day had talked to Investigator Thomas

---

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

Walker, who told Smith that he wanted to talk to Henry, if Smith saw him. Walker did not advise Smith to place Henry under arrest. According to Smith, he therefore told Henry that an investigator wanted to talk to him. Henry walked around the patrol car and, at Smith's request, got in the front seat and closed the door. Smith then told him that the police wanted to talk about the burglary. Smith testified:

> I asked him would he mind coming down. As I said, he asked me what it was about and I said it was something about a burglary. And he said he didn't do any burglaries. And I said, "Well, you might as well go down and get it straightened out." And he said, "OK." And just prior to leaving, he reached over and got my police hat and put it on his head and was cutting up with the kids and laughing, and, we drove down....
>
> .    .    .    .    .
>
> We went down to police headquarters, and on the way he said, "Are you going to bring me back, will you give me a ride back?" I said, "sure."

Henry's account was slightly different. He testified that he heard over Smith's radio that there was a locate out for him and that they wanted him to come in and talk to Walker. Then, Henry said, Smith got out of the car, and "[h]e just patted me down the side, down my legs and on my arms, just real fast." Then Smith asked him to "[j]ump in the car" and they drove downtown. Henry asked Smith a question while on route:

> I asked him what would happen if I woulda, wouldn'a, gone with him, if I woulda turned around and ran. He said, well, he wouldn't have done nothing, but he would just called in and I would eventually got caught again and taken in.[1]

1. Smith did not recall such a conversation.

2. Pursuant to *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n.4 (Alaska 1978) and *Cooksey v. State*, 524 P.2d 1251, 1255–56 (Alaska 1974). The prosecutor stipulated that the fingerprint issue was dispositive of the case.

The police and Henry also differed slightly as to what transpired at the station. Walker testified that he told Henry that he wanted to talk to him about a burglary and needed Henry's fingerprints, and that Henry replied " 'fine,'–at least he agreed and made *no objection....* " Henry, on the other hand, testified that Walker told him he wanted to come over and take his fingerprints; Henry felt he had no option to refuse. Both agree that after Henry's prints were taken Walker read him his *Miranda* rights. Henry claims he was then immediately arrested and incarcerated while Walker said he did not arrest Henry until he learned from the ID technician that Henry's prints matched those found at the scene. Henry did not give a statement to the police.

Henry waived his right to an indictment and was bound over for trial for burglary after a preliminary hearing on September 12, 1978. After holding a hearing and receiving memoranda on Henry's motion to suppress the fingerprint evidence, the trial court denied the motion on November 30. The following day Henry entered a *nolo contendere* plea to the burglary charge, reserving the right to appeal the suppression ruling.[2]

### A. The Initial Contact: Consent or Detention

The state concedes that there was no probable cause to arrest Henry before his fingerprints were identified, and that if Henry is found to have been in custody at the stationhouse his prints must be suppressed. The issue, then is simply whether Henry was in custody, or whether he was voluntarily present at the police station.

In *Hunter v. State*, 590 P.2d 888 (Alaska 1979), we discussed the question of what constitutes custody.[3] We adopted a reason-

3. The question in *Hunter* was whether statements given by Hunter to the police in the absence of *Miranda* warnings had to be suppressed. The rationale of that case regarding custody is applicable here, even though the issue is slightly different.

able person perspective for determining whether a person is in "custody or otherwise significantly deprived of his freedom of action in any significant way."[4] We held that the inquiry is whether:

in the absence of actual arrest something . . . [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.[5]

We went on to explain:

This requires some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning.

At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning–whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation–whether the defendant left freely, was detained or arrested–may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.[6]

There is no evidence to support a conclusion that prior to the matching of Henry's fingerprints to those found at the burglary scene, the police affirmatively deprived Henry of his freedom of action. Henry was not placed under formal arrest.[7] He rode unrestrained in the front seat of the patrol car, and felt uninhibited enough to put on Smith's police hat and joke with his friends. Henry testified that Smith told him he would not be pursued if he decided to leave. He was not questioned about the burglary en route to the police station or upon his arrival, but merely asked to give his fingerprints. After it was determined that his prints matched those found at the burglary scene, he was placed under arrest, given his *Miranda* rights, and his request not to be questioned was respected.

It may be true that Henry felt obligated to go to the police station, but it is clear that he was not under the impression that officer Smith would make him go. He testified: "I was under the impression that I was supposed to go down, but not with force."

In summary, we believe that under the facts of this case, using the *Hunter* standard, Henry was not in custody when he was fingerprinted. The only "coercive" aspects of Henry's contact with the police were those inherent in any citizen's contact with the law:

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.

*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). This "inherent coercion," without more, does not mandate suppression of Henry's fingerprints. The fact that police custody materialized and Henry was placed in custody as a result of his visit to the station, does

---

4.  590 P.2d at 894, *quoting United States v. Hall*, 421 F.2d 540, 543–44 (2nd Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

5.  590 P.2d at 895, *quoting United States v. Hall*, 421 F.2d at 545 (footnote omitted).

6.  590 P.2d at 895.

7.  Smith testified that when a suspect is arrested proper procedure is to handcuff him and place him in the back seat of the patrol car with the window up.

not convert the events prior to his arrest into an unlawful detention. *Childs v. State*, 584 S.W.2d 783, 789 (Tenn. 1979).[8]

B. *Henry's Consent to Fingerprinting*

[2–4] Henry also argues that his consent to be fingerprinted was constitutionally invalid because the state did not show that he knew he had the right to refuse. This has been a frequently litigated issue with regard to searches. The United States Supreme Court rejected Henry's position in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and most state courts have followed *Schneckloth*,[9] including this court in *Frink v. State*, 597 P.2d 154 (Alaska 1979). There we said:

Frink implicitly admits the record supports a finding of voluntariness under *Schneckloth* but argues that Alaska's guarantee against unreasonable searches and seizures requires a different consent standard. Frink argues that the state, to show consent, must specifically prove that he knew of this right to refuse to allow the search. The Court in *Schneckloth* rejected the argument, and we do not believe that the Alaska Constitution requires a different standard for noncustodial consent searches.

*Id.* at 169 (footnotes omitted). We find that this holding applies to consent to fingerprinting as well as to searches. Of course, this conclusion does not eliminate the need for a finding of voluntariness. *Schneckloth* requires an examination of all the surrounding circumstances to determine if in fact the consent to search was coerced.[10] Applying that test here, we find that Henry voluntarily agreed to be fingerprinted. Hence, we hold that Henry's consent was validly given.[11]

The judgment of conviction is AFFIRMED.

---

8. This case is therefore quite different from *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), which appellant relies on to support his suppression argument. In *Davis* the defendant was illegally detained, and the Supreme Court adopted the conclusion of the D.C. Circuit in *Bynum v. United States*, 262 F.2d 465 (1958), that fingerprints are indistinguishable from other products of unlawful detention, such as statements and physical evidence, and that if one such product of illegal detention is proscribed then all should be proscribed. 394 U.S. at 724, 89 S.Ct. at 1396. However, we find that Henry's visit to the stationhouse was voluntary and his fingerprints were not the product of an illegal detention. Thus, the rule of *Davis* and *Bynum* does not apply in this case.

9. *See, e. g., People v. James*, 19 Cal.3d 99, 137 Cal.Rptr. 447, 561 P.2d 1135, 1144–46 (Cal. 1977); *People v. Hayhurst*, 571 P.2d 721, 724 (Colo. 1977); *State v. Price*, 52 Haw. 442, 521 P.2d 376, 377 (1974). Henry has cited only one jurisdiction that has rejected *Schneckloth*: New Jersey, in *State v. Johnson*, 68 N.J. 349, 346 A.2d 66 (1975). Many commentators have criticized the *Schneckloth* rationale, *see, e. g.*, 2 W. LaFave, Search and Seizure, § 8.1(a) (1978). The ALI Model Code of Pre–Arraignment Procedure also rejects the rationale. ALI Model Code of Pre–Arraignment Procedure § SS.240.2 (April 1975 Draft). We recognize that good arguments can be made in favor of a stricter consent standard in the fourth amendment context. Nevertheless, we find that the *Schneckloth* rule strikes the appropriate balance between the need for effective police work and the need to prevent coerced consent. As the *Schneckloth* Court explained, consent searches commonly occur under informal circumstances. Often they are the logical extension of investigative police questioning, with the need for the initial request to search arising quickly and unexpectedly. *Schneckloth v. Bustamonte*, 412 U.S. at 232, 93 S.Ct. at 2050, 36 L.Ed.2d at 865. Under such circumstances the formal waiver requirements appropriate in a trial setting or during custodial interrogation would unjustifiably hamper proper police investigation.

10. *Schneckloth v. Bustamonte*, 412 U.S. at 233, 93 S.Ct. at 2050, 36 L.Ed.2d at 866.

11. Henry makes one other argument here, that his fingerprints should be suppressed because of the police failure to comply with Alaska R.Crim.P. 16(c)(1) regarding fingerprinting by judicial order. That rule, however, clearly has no relevance when the person whose prints are sought consents to give them.