Edward P. LOWRY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–249.

Court of Appeals of Alaska.

Oct. 11, 1985.

Edward P. Lowry, pro se.

Maryann E. Foley, and Alan Higbie, Lynch, Farney & Crosby, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Following a jury trial, Edward P. Lowry was convicted of the first-degree murder of his wife, Sally Dale Lowry. Lowry appeals his conviction, arguing that the trial court erred in failing to suppress certain statements made by Lowry during police interrogation and certain evidence seized from Lowry's home by a private security guard. While we find no error in the trial court's refusal to suppress statements made by Lowry during his interrogation, we find that evidence was improperly seized from Lowry's home. Accordingly, we reverse Lowry's conviction and remand the case for a new trial.

## FACTS

On December 24, 1982, Anchorage fire fighters were called to put out a fire in a duplex in Spenard and found the burned remains of a human body in the fireplace. Despite an outside temperature of only 11° F., the windows of the duplex were open, creating a draft that allowed the fire to burn more rapidly. Wood in the wall of the house underneath the fireplace was burning, indicating that some type of inflammable liquid had been used on the fire. An accelerant had also apparently been used on the body. Subsequent investigation revealed that the body was that of Lowry's wife. It appeared that the victim was dead before being exposed to the fire. The position in which the body was found was inconsistent with death by natural causes, an accident, or suicide.

Anchorage Police Lieutenant Doug Jones was called to the scene of the fire. He learned from neighbors that Lowry and his wife lived in the house. Inside the house, Jones found dispatch papers indicating that Lowry was on a job in Eagle River. Jones instructed Officer John Reed to try to contact Lowry by telephone. When Reed reached Lowry on the job and told him the police wanted to speak to him, Lowry expressed a willingness to talk and asked if he should return to Anchorage or if the police would come to his work place to meet with him. Reed told Lowry to stay where he was. Police cars in the Eagle River area were then contacted by a police dispatcher, who requested that Lowry be contacted and detained, but not arrested. Because of the serious nature of the crime and because a number of guns were found

in the Lowry residence, Lowry was described as potentially armed and dangerous. This description was in keeping with normal police procedure.

At about 10 a.m. the same morning, shortly after receiving the police dispatch, two Anchorage police officers in separate patrol cars reached Lowry's jobsite. They saw Lowry seated in his car. The officers pulled their squad cars behind Lowry. Using a squad car public address system, they told him to get out. As Lowry emerged from his car, one officer held a shotgun leveled at him while the other approached and frisked him. A brief search of Lowry's car was conducted for weapons, and when no weapon was disclosed, the officer with the shotgun replaced it in his patrol vehicle.

Following the initial stop, one of the officers expressly advised Lowry that he was not under arrest. The officer asked if Lowry would be willing to accompany the police to the station in Anchorage for questioning, and Lowry agreed. Lowry remained at the scene for approximately five or six minutes, until a police investigator from Anchorage arrived. In the interim, several additional uniformed officers arrived. Lowry then entered a police car and was driven to Anchorage. He was not handcuffed or otherwise physically restrained.[1]

In Anchorage, two investigators talked with Lowry for about thirty or forty-five minutes without advising him of his *Miranda*[2] rights. They did not talk specifically about the homicide, but Lowry recounted a history of marital difficulties occurring over the past year and a half. When Lowry was eventually advised of his rights, he declined to sign a written waiver and, shortly thereafter, asked for an attorney. The questioning ceased, but Lowry remained at the police station. He was formally arrested between two and three o'clock that afternoon.

Soon after Lowry's arrest, police obtained search warrants for his residence and his automobiles. They also obtained a warrant permitting the taking of blood samples from Lowry. Pursuant to the latter warrant, Lowry was transported to Humana Hospital, where Dr. Donald Rogers drew specimens of Lowry's blood. According to Dr. Rogers, the blood specimens contained levels of codeine and valium that were "well above the therapeutic range ... in the low toxic range." Dr. Rogers stated that, while a person with such levels of codeine and valium in his system would be unlikely to experience hallucinations, he could be expected to be drowsy or depressed, and he might suffer distorted perceptions and judgment. Dr. Rogers further opined, however, that a person taking codeine and valium regularly could develop a tolerance to both drugs.

While police officers attempted to locate and contact Lowry, fire fighters at the Lowry residence found it necessary, in order to put out the fire, to cut a large hole in the outside wall of the house and remove the fireplace. Because of the security problem this created, the coroner's office—charged with the duty of preserving the victim's property intact—contracted with Smith Security Service, a private guard firm, to station guards at the house. Pursuant to the contract, Wesley Klein, a Smith guard, was assigned to the house from midnight to 10 a.m. on December 30. Klein, evidently bored, picked up a book from the hall closet bookshelf and began to read it. Inside the book Klein found some

---

1. Lowry's version of the events in Eagle River differed markedly from the version presented by the police. Lowry contended that four or five police vehicles, containing eight or nine officers, converged simultaneously on his car, blocking its exit. According to Lowry, the officers, with drawn guns, surrounded him and he was forcibly removed from his vehicle, frisked, and handcuffed. He was then placed in the back of a squad car without being given any choice in the matter. Lowry's version of the incident was implicitly rejected by the trial court. In keeping with the trial court's ruling, the facts are set out in the text in the light most favorable to the state. *See Deal v. State,* 626 P.2d 1073, 1079 (Alaska 1980).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

folded, handwritten notes. He read the top sheet, concluded that the papers might be important to the murder investigation, and turned them over to the police. One of the notes found by Klein contained two poems written by Lowry. The poems were admitted into evidence at trial by the prosecutor on the issue of Lowry's intent.

## DISCUSSION

### A. Suppression of Lowry's Statements

On appeal, Lowry argues that the trial court erred in refusing to suppress from evidence statements that he made between the time he was contacted by the police in Eagle River and the time he invoked his right to counsel later the same morning. In support of this argument, Lowry advances two closely-related theories, both premised on the claim that his initial contact with the police amounted to an arrest. First, Lowry maintains that he was arrested without probable cause. He reasons that his subsequent statements at the police station must be suppressed as fruits of the unlawful arrest. Second, Lowry notes that he was not given *Miranda* warnings until he had been at the police station for approximately thirty to forty-five minutes. He insists that all statements he made before receiving *Miranda* warnings were obtained by the police in violation of his right to remain silent and must therefore be suppressed.

The state responds by adopting the same position relied on by the trial court as a basis for rejecting Lowry's pretrial motion to suppress evidence: that the initial contact between the police and Lowry in Eagle River did not amount to an arrest but was, instead, an investigative stop. According to the state, once the investigative stop had been accomplished, Lowry voluntarily consented to accompany the police to Anchorage for an interview. Although we believe the issue to be an extremely close one, we find that the state's argument has merit.

■ At the outset, the state correctly acknowledges that the initial encounter between the police and Lowry in Eagle River amounted at least to a temporary seizure of Lowry's person—an investigative stop. *See Waring v. State*, 670 P.2d 357, 366 (Alaska 1983); *Coleman v. State*, 553 P.2d 40, 43–45 (Alaska 1976). *See also Howard v. State*, 664 P.2d 603, 608–609 (Alaska App.1983); *Romo v. Anchorage*, 697 P.2d 1065, 1067–1068 (Alaska App.1985). There can be little doubt that the stop would have ripened into a full-blown arrest if Lowry had still been in detention when transported to Anchorage for questioning; probable cause as well as the administration of *Miranda* warnings would then have been required. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *State v. Cassell*, 602 P.2d 410, 415 (Alaska 1979); *Howard v. State*, 664 P.2d at 610 (Alaska App.1983).

Yet, in the present case, the trial court determined that Lowry's transportation to Anchorage and his interrogation at the police station was not a continuation of the initial investigative stop. The court found, rather, that Lowry was taken to Anchorage voluntarily, after consenting to be interviewed at the police station. We find substantial evidence in the record to support the trial court's finding of voluntary consent.

■ We nevertheless recognize that the issue of consent in this case is a particularly troublesome one. By definition, the liberty of any individual who is subjected to an investigative stop is restrained; hence, the stop operates as a seizure for purposes of the fourth amendment. *Waring v. State*, 670 P.2d 357, 366 (Alaska 1983). Certainly, a temporary stop cannot be equated with a formal arrest, even when considerable force is used in effectuating the stop. *See Howard v. State*, 664 P.2d 603, 608–609 (Alaska App.1983). Yet, especially when force is used or a display of weapons is made, a person who has been stopped and placed in the effective custody—albeit temporary—of the police may find little consolation in being advised that a formal arrest has not been made. The person so detained will certainly understand that he has been placed in custody,

but he may not understand the temporary nature of the seizure unless it is explained. And if, as is likely, the person does not understand the technical distinction between an investigative stop and a formal arrest, a mere statement that he has not been arrested may not suffice to inform him of the temporary nature of the detention; he may not realize that he will be free to leave as soon as the police have completed the brief, on-the-scene investigation that constitutes a stop.

In such a case, there will be a significant risk that the detained person's consent to a station house interview stems not from any genuine desire to be interviewed but rather from the impression that refusal to consent would be futile—that custody already exists and there is no power to decline the request for a trip to the station. The risk of a consent so tainted can be obviated by expressly informing the detained person, before asking for consent to a station house interview, that the stop is a temporary investigative measure and that the person is, or shortly will be, free to go. Alternatively, the risk may be avoided when other attendant circumstances make the temporary nature of the stop reasonably apparent.

In the present case, we believe sufficient circumstances existed to allow the trial court to find that Lowry's consent to a station house interview was voluntary and not merely the result of a belief that refusal to consent would be futile. When viewed in the light most favorable to the state, the record indicates that, shortly after being stopped and frisked by two uniformed police officers, Lowry was expressly told that he was not under arrest and

was asked if he would accompany police to the station in Anchorage for questioning. Lowry readily agreed. At the time, he was not handcuffed or otherwise physically restrained. While the officers had used firearms in the initial encounter, the guns were put away when it was determined that Lowry was not armed. No firearms were displayed when Lowry was asked to go to Anchorage for questioning, and only two officers and one squad car were present. It is particularly significant that, prior to the investigative stop in Eagle River, the police had contacted Lowry by telephone and that Lowry had expressed a willingness to talk to the police and had volunteered to drive from Eagle River to his home to meet with police investigators.

We believe the trial court, in finding that Lowry voluntarily consented to a station house interview, could reasonably rely on Lowry's apparent predisposition to be interviewed, the fact that he was expressly advised that he was not under arrest, and the reduced level of force and confrontation involved in the investigative stop when the request for Lowry to accompany police to Anchorage was actually made. These same factors also distinguish the present case from prior cases involving similar circumstances. *See, e.g., State v. Cassell,* 602 P.2d 410, 414–15 (Alaska 1979); *Hampel v. State,* 706 P.2d 1173, Op. No. 517 (Alaska App., September 27, 1985).[3] The trial court's finding that Lowry's consent was not tainted by the circumstances of the investigative stop is not clearly erroneous.

■ Lowry has separately attacked the trial court's finding of consent by relying on the medical evidence indicating that he was under the influence of codeine and

---

3. *Compare Cassell* and *Hampel* with *Henry v. State,* 621 P.2d 1 (Alaska 1980), and *Hunter v. State,* 590 P.2d 888 (Alaska 1979). The situation in the present case differs from the situation in *Henry* and *Hunter* in one significant respect, that is, neither *Henry* nor *Hunter* involved initial encounters between the defendants and the police arising to the level of an investigative stop. By contrast, Lowry's initial encounter with the police obviously qualified as an investigative stop and amounted to a seizure for constitutional purposes.

The legal issue presented in *Henry* and *Hunter* is thus markedly different from the issue presented in this case. In *Henry* and *Hunter,* the court was required to determine whether the confrontation between the police and the defendants ever rose to a level that could be considered custodial. In this case, the question is whether an initial confrontation between the police and Lowry, which involved temporary custody, subsequently developed into a full arrest.

valium. He maintains that this evidence establishes that he was incapable of voluntarily and knowingly consenting to accompany the police for an interview. We reject Lowry's argument. The medical evidence concerning Lowry's consumption of drugs was equivocal, because it indicated that a person who regularly used valium and codeine could develop a tolerance to both drugs. Moreover, the medical evidence was not the only evidence from which the court could infer that Lowry was capable of giving a valid consent. The observations of the officers who dealt with Lowry furnished an ample basis upon which the trial court could rely to conclude that, despite his ingestion of medication, Lowry was capable of understanding his situation and making rational decisions. *See Phillips v. State*, 625 P.2d 816, 817 n. 5 (Alaska 1980). Upon consideration of the totality of the circumstances, we hold that the superior court did not err in finding a voluntary consent and in refusing to suppress evidence obtained from Lowry's interview.

### B. Suppression of Evidence Seized from Lowry's Home

Prior to trial, Lowry moved to suppress from evidence the notes taken from his home by security guard Wesley Klein. Although the trial court found that Klein's warrantless seizure of the notes constituted a "technical violation," the court denied Lowry's motion to dismiss. One of the notes, which contained two poems written by Lowry, was subsequently admitted into evidence at trial and became the focal point of considerable dispute. Lowry argues that the trial court's ruling was error.

The state asserts that this evidence was properly seized, relying on two separate theories. Initially, the state contends that Klein was not engaged in law enforcement activities when he found the note and that

he should therefore be treated as a private citizen, to whom Fourth Amendment constraints do not apply. The state bases this argument on our decision in *D.R.C. v. State*, 646 P.2d 252 (Alaska App.1982). In that case, we held that public school teachers, although public employees, are not subject to state and federal constitutional limitations on searches and seizures, because their employment does not entail a law enforcement function.[4]

Although the state's reliance on *D.R.C.* is understandable, a recent decision of the United States Supreme Court has now made it clear that this aspect of *D.R.C.* was incorrectly decided. In *New Jersey v. T.L.O.*, 469 U.S. ——, ——, 105 S.Ct. 733, 739–41, 83 L.Ed.2d 720, 729–31 (1985), the Supreme Court squarely held that school teachers are state agents subject to the restrictions of the fourth amendment. The Court soundly rejected the notion that state agency, for fourth amendment purposes, is tied to the existence of a law enforcement function:

It may well be true that the evil toward which the Fourth Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using general warrants or "writs of assistance" to authorize searches for contraband by officers of the Crown. But this Court has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action"—that is, "upon the activities of sovereign authority." Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities.... [Citations omitted.]

*Bell v. State*, 519 P.2d 804, 807–08 (Alaska 1974) (holding that a security officer employed by a state-owned airport was a state agent subject to constitutional search and seizure limitations because his regular duties included law enforcement functions and criminal investigation).

---

**4.** Our holding in *D.R.C.* was, in turn, primarily based on our interpretation of two Alaska Supreme Court decisions, *J.M.A. v. State*, 542 P.2d 170, 174–76 (Alaska 1975) (holding that a foster parent, although paid by the state, is not a state agent for purposes of applying the constitutional limitations on searches and seizures), and

*New Jersey v. T.L.O.*, —— U.S. at ——, 105 S.Ct. at 740, 83 L.Ed.2d at 730.

■ In this case, there can be little doubt that Klein acted as state agent in guarding Lowry's residence. At the time he found the handwritten note, Klein was performing duties for which the office of the coroner was directly responsible. The performance of those duties had been contractually delegated to Klein's company by the coroner's office. Thus, Klein exercised state authority in performing his duties at the Lowry residence. Under the Supreme Court decision in *T.L.O.*, the fact that Klein's duties did not directly involve a law enforcement function does not render him immune from application of the constitutional restrictions against warrantless searches and seizures.

■ The state next maintains that even if Klein must be considered an agent of the state to whom the fourth amendment applies, his warrantless seizure of the handwritten note can be justified under the plain view exception to the warrant requirement. Under this exception, warrantless seizure may be justified when an article is actually in plain view and when the intrusion that initially afforded a view of the article was lawful, its discovery was inadvertent, and its incriminating nature was immediately apparent. *See, e.g., Deal v. State*, 626 P.2d 1073, 1078–79 (Alaska 1980).

The state's reliance on the plain view doctrine in this case is wholly unjustified. As a custodian acting on behalf of the coroner's office, Klein had authority to be present inside the Lowry residence, yet the scope of his authority clearly did not exceed the purpose for which his presence was required: to assure the security of the premises. Nothing in the record supports the contention that, as a security guard, Klein had the authority—out of boredom or for any other reason—to rummage through the personal articles and effects in the home or to unfold and browse through handwritten notes that he found while rummaging.

■ It is inconceivable to us that the handwriting on the note could be regarded as being in plain view when the note itself was folded and was located inside a book on the bookshelf of Lowry's hall closet. *See Anderson v. State*, 555 P.2d 251 (Alaska 1976). In no realistic sense was the note "knowingly exposed to the public." *Id.* at 256. Given the facts in the record, we must hold that the note was not in plain view.

The state's final argument with respect to the admissibility of the disputed note is that, even if it was illegally seized, suppression is an unwarranted sanction. The state maintains that the note was seized in good faith conformity with a valid warrant and that the purposes of the constitutional restrictions on warrantless searches would not be served by applying the exclusionary rule to this case. The state points out that, after finding the notes, Klein turned them over to Officer Mosher of the Anchorage Police Department. Before accepting them, Mosher contacted a police investigator to determine whether it would be lawful for him to seize them. The investigator told Mosher that there would be no problem, since there was an outstanding search warrant for the Lowry residence. A search had already been made pursuant to the warrant, but the return on the warrant had not been formally made and, on its face, the warrant had not yet expired. Although the state acknowledges that the warrant was restricted to the hours of 7 a.m. to 10 p.m. and that Klein gave the handwritten note to Mosher at 2:20 a.m., it argues that this technical non-compliance does not justify suppression.

We believe the state's argument with respect to suppression fundamentally misconceives the nature of the constitutional violation in this case. The warrant clauses of the United States and Alaska Constitutions were violated here not by Officer Mosher's decision to accept the notes from Klein, but rather by Klein's own warrantless intrusion into the personal effects in the Lowrys' home. In rummaging through the closet bookshelf, opening a book, and finding, unfolding and reading the notes

contained therein, Klein did not purport to act in good faith compliance with an outstanding search warrant. Indeed, he had no knowledge that a warrant existed and would have had no authority to assist in its execution had he known. Klein clearly either knew or should have known that his authority to be present in the Lowry residence derived from a state agency, the Coroner's Office, and was limited in scope. The impermissible nature of Klein's conduct cannot be characterized as merely technical; nor is this the type of non-deterrable conduct that plainly falls outside the purposes of the exclusionary rule. *See Harker v. State*, 663 P.2d 932, 934–35 (Alaska 1983).[5]

■■■ No other argument is advanced by the state with respect to the admissibility of Lowry's handwritten note, and none is readily apparent. Accordingly, we are constrained to find that the superior court erred in denying Lowry's motion to suppress this evidence. Ordinarily, admission into evidence of the handwritten poems contained in the note might have amounted to harmless error. As it happened in this case, however, the poems became the centerpiece of the prosecution's cross-examination of Lowry and a mainstay of its final argument to the jury. The prominence given to the poems in the course of trial precludes any finding of harmless error. The error in admitting this evidence requires that Lowry's conviction be reversed and that a new trial be held.[6]

The conviction is REVERSED, and this case is REMANDED for a new trial.

SINGLETON, Judge, concurring.

I join in the court's decision to reverse. Because of the show of force preceding the

5. Our conclusion that the constitutional violation here resulted from Klein's conduct rather than Mosher's and that this conduct was not undertaken in good faith reliance on a search warrant renders inapposite the United States Supreme Court's decision in *United States v. Leon*, 468 U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Accordingly, we need not consider whether *Leon* should be adopted in interpreting the Alaska Constitution's search and seizure clause, and we express no view on the issue.

6. Lowry has raised a number of additional issues which we need mention only briefly:

(a) Lowry claims that he was illegally arrested at the jobsite in Eagle River and that statements and evidence obtained from him following the illegal arrest were improperly used before the grand jury, thereby requiring dismissal of his indictment. Our ruling that Lowry was not illegally arrested and that he voluntarily consented to an interview in Anchorage disposes of this issue.

(b) Lowry claims that error was committed at trial by the admission of statements that he made after being apprised of his *Miranda* rights and requesting counsel. Our examination of the record convinces us that the prosecution did not admit into evidence any statements made by Lowry in response to custodial interrogation after he had invoked his *Miranda* rights.

(c) Lowry's contention that the handwritten poems were irrelevant and therefore inadmissible is rendered moot by our decision that suppression of the poems is required on constitutional grounds.

(d) Lowry contends that the trial court abused its discretion in admitting on rebuttal evidence of prior assaultive conduct toward his wife. We hold that the trial court did not abuse its discretion in admitting this evidence.

(e) Lowry's argument that he received ineffective assistance of counsel is largely rendered moot by our reversal in this case, because Lowry is currently represented by new counsel. To the extent the claim is not moot, an evidentiary hearing will be required before it is ripe for decision. See *Barry v. State*, 675 P.2d 1292 (Alaska App.1984). The record indicates that the superior court intended that Lowry be granted a hearing on his ineffective assistance of counsel claim, but the hearing was never held, apparently through oversight. We assume that, upon remand, Lowry will be given an opportunity for a hearing on this issue if he elects to pursue it further.

(f) Lowry claims that a new trial should have been granted as a result of an improper demonstration conducted by the prosecution during the rebuttal portion of its closing argument to the jury. Because Lowry's claim is predicated in large part on the timing of the state's demonstration and his consequent inability to respond, it appears that the issue is unlikely to recur on retrial. In the event the prosecution contemplates resorting to a similar demonstration on retrial, however, it should make its intent known to the trial court in advance of final arguments, and the trial court should determine, in an adversarial context, the manner in which any such demonstration will be conducted.

(g) Lowry's sentence appeal is moot in light of our reversal.

initial seizure of Lowry, I cannot agree that Lowry consented to accompany the officers to the station house, obviating any need for *Miranda* warnings. *See Dunaway v. New York*, 442 U.S. 200, 206–16, 99 S.Ct. 2248, 2253–58, 60 L.Ed.2d 824, 832–38 (1979). I would therefore hold that Lowry's statements to the police were obtained in violation of his rights, as recognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and in the event of a retrial, must be suppressed. I agree with the other conclusions reached in the majority's opinion concerning any new trial.