**Christopher L. LONG, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–3996.

Court of Appeals of Alaska.

July 31, 1992.

As Revised on Grant of Rehearing
Sept. 25, 1992.

Marvin Hamilton, Asst. Public Defender, Barrow, and John B. Salemi, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Christopher L. Long was convicted of second-degree burglary, AS 11.46.310(a), following a court trial in the Barrow superior court. He appeals his conviction, asserting that his confession to this crime should have been suppressed because he was in custody and the police failed to inform him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We remand for further proceedings.

On September 15, 1990, Long and an accomplice named Herman Oyagak burglarized the Nuiqsut Trading Post, a general store in the village of Nuiqsut. Three days later, the police questioned Oyagak about the burglary; Oyagak confessed that he and Long had committed the crime. In the early afternoon of September 18, Officer Earl Bresette went to interview Long. Long confessed to having committed the burglary, and he returned the stolen money to the police.

After Long was indicted for this crime, he asked the superior court to suppress his statements to the police, asserting that these statements had been taken in violation of *Miranda*. The State conceded that Long had never been advised of his *Miranda* rights, but the State contended that no advisement of rights had been necessary because Long had not been in custody during the interrogation. Superior Court Judge Michael I. Jeffery ruled that Long had not been in custody and therefore Long's statements were admissible against him. The correctness of this ruling is the main issue on appeal.

Long was the sole witness at the suppression hearing. Because Long provided the only sworn account of the events being litigated, Judge Jeffery relied solely on Long's testimony in deciding the suppression motion. In reviewing Judge Jeffery's decision, we have done likewise.

Long was working as a carpenter at a construction site just across the street from the burglarized building. On the afternoon when Officer Bresette came to question him, Long was on the second story, putting up plywood panels. From this vantage point, Long saw Bresette approaching the work site. Long knew that Bresette was probably coming to see him, so he went downstairs to meet Bresette.

Bresette told Long that he was a suspect in a burglary and that he wished to speak to Long about this crime. Bresette then asked Long to come with him to the police

station, which was located about one-half block down the street. Long did not want to lose any pay from his job, so he asked Bresette if the matter could wait until after work. Bresette responded that the matter was important and could not wait. Long decided to accompany the officer.

Long's precise reasons or motives for leaving work and going to the police station were hotly disputed in the superior court. On direct examination, Long described his decision this way:

DEFENSE ATTORNEY: Did you want to leave work?

LONG: No, I didn't.

DEFENSE ATTORNEY: Did you tell the officer that you didn't want to leave work?

LONG: Yes, I did.

DEFENSE ATTORNEY: And what did he say to that?

LONG: He told me that it was important, and we got to go to the station, so he's got to question me. So I said, "Fine—let's go to the station." So I followed him to the station.

DEFENSE ATTORNEY: Did you think you had a choice?

LONG: No, not really.

DEFENSE ATTORNEY: What do you think would have happened if you [had] said, "No, I'm staying at work."?

LONG: Well, I thought, "If I stay at work and he wants to question me, I might get in trouble." So I thought, "Well, if this is so important, I'll dock myself an hour for work." So I did. So I followed him ... to the station.

On cross-examination, Long described the encounter this way:

PROSECUTOR: [Y]ou say he asked you to come to the station, right?

LONG: Yes, to ask some questions.

PROSECUTOR: Right. But he actually asked you, "Will you come to the ...

LONG: Yes.

PROSECUTOR: ... station?" Okay. And, at first, you didn't want to go, right?

LONG: I said, "Can't this wait till after work?" And he goes, "No, this is important."

PROSECUTOR: He said it was important?

LONG: Yes.

PROSECUTOR: So is that why you decided to go, because you thought it was important?

LONG: Yes.

PROSECUTOR: So you decided to go because you thought it was important, not because Officer Bresette was making you go?

LONG: I decided to go because it was important and ...

PROSECUTOR: That's ...

LONG: ... I thought ...

PROSECUTOR: ... fine.

LONG: ... that I really had to go.

The parties agree that Bresette made no statement to Long indicating whether Long was under arrest or not. However, Long was neither frisked nor handcuffed. He seated himself in the front seat of Bresette's police vehicle (not in the back, where prisoners are generally transported), and they drove the short distance to the station. At the hearing, Long admitted that, if he had to be interviewed, he preferred having it done in the warmth of the police station rather than exposed to the arctic September weather at the construction site.

Long was interviewed in the main room of the Nuiqsut police station. This room is open to the public and functions as office and reception area. Bresette and the other officer participating in the interview were seated behind desks, while Long sat in a chair with the entrance to the police station at his back. The door remained unlocked, and no officer guarded the door. Long testified that he did not feel nervous or afraid, and that the police station was a "pretty laid-back place".

From the outset, Long understood that the police knew he had participated in the burglary. He gave somewhat ambiguous and conflicting testimony concerning whether he felt free to leave the interview. Long testified that he feared he would be

in worse trouble if he did not go through with the interview. A little later in the hearing, Long testified that he thought the police might have arrested him if he had left the interview. But, on cross-examination, Long apparently conceded that he knew he could have left the police station if he had wanted to, and that he chose to stay so that he could get the matter over with.

At the end of the questioning, the police asked Long if he would return the money stolen during the burglary. Long replied, "Sure, let's go get the coins." Bresette and Long went to Long's house (which was just down the street). While Bresette waited in the "konuchuk" (a small entry porch that insulates the true front door from the outside arctic air), Long went into the house proper, retrieved the money from upstairs, and then returned to where Bresette was waiting.

Bresette and Long went back to the police station with the money. Long asked if he could leave then, but the police insisted that Long stay and watch the counting of the money so there would be no dispute later about how much was returned. After the money was counted, the police offered to drive Long back to his work site, but Long declined, preferring to walk. Long was not arrested until one month later, after the Barrow grand jury indicted him for the burglary.

Based on the foregoing testimony, Judge Jeffery concluded that Long had not been in custody when he was interviewed by the police in Nuiqsut. Judge Jeffery listened at least twice to the tape recording of that interview, and he found that the tone of the interview had been low-key, not heavy-handed. He also noted that Long had freely left to return to work when the interrogation was over. Judge Jeffery acknowledged that Long had been under some pressure to cooperate with the police by going with them and submitting to their questions. But, analogizing Long's case to the circumstances presented in *Henry v. State*, 621 P.2d 1 (Alaska 1980), Judge Jeffery found that the pressure Long had experienced was the normal pressure any other citizen would experience when confronted with a police officer pursuing a criminal investigation.

Judge Jeffery concluded:

Long made the call. He could have taken care of it right then, or he could have waited till later. He decided to take care of it right then. I don't think we've got anything more here than what the *Henry* case says [is not custody]. So, looking at the objective facts from the [view]point of a reasonable person, I find that he was not in custody.

Judge Jeffery also interpreted Long's testimony as fully supporting this conclusion. Judge Jeffery found, as a factual matter, that Long thought he was free to walk out the door of the police station rather than continue the interrogation—that is, that Long did not believe he was in custody.

█ Custody exists when police actions create "inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak [when] he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. In *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979), the Alaska Supreme Court established an objective test for determining whether a person is in custody: under the circumstances of the police interaction with the suspect, would a reasonable person have felt free to break off the interrogation and, depending on the location, either leave or ask the police to leave?

█ This question is to be answered, not by reference to the subjective intentions or suspicions of the police, but by examining the objectively manifested circumstances of the interview: "the events which took place before the interrogation, including those which explain how and why the defendant came to the place of questioning", "the manner and scope of the actual interrogation", "and, where relevant, what happened after the interrogation." *Quick v. State*, 599 P.2d 712, 717 (Alaska 1979).

As noted above, Officer Bresette made no direct statement to Long, one way or the other, whether Long was under arrest. Long argues that Bresette's request for him to attend an interview at the police

station, coupled with Bresette's failure to tell him that he was not under arrest, indicate that the ensuing interview was custodial. The State argues the converse: that, since Long was never told that he was under arrest, Long would have believed that it was his choice whether or not to attend the interview.

■ This court has previously held that a trial court should take into account whether the police told the suspect that he was under arrest, or told him that he was not under arrest, or failed to clarify the suspect's status. However, this is but one factor to be evaluated when determining whether an interview was custodial, and this factor must be viewed in context. Even when a suspect is assured that he is not under arrest, the circumstances of his contact with the police may belie this assurance and convince the suspect that he indeed is in police custody:

> In such a case, there will be a significant risk that the detained person's consent to a station house interview stems not from any genuine desire to be interviewed but rather from the impression that refusal to consent would be futile—that custody already exists and there is no power to decline the request for a trip to the station.

*Lowry v. State*, 707 P.2d 280, 284 (Alaska App.1985); *see also Hampel v. State*, 706 P.2d 1173 (Alaska App.1985). By the same token, an officer's subjective intent to restrain the defendant and not allow him to terminate the interview is irrelevant unless that intent is objectively communicated (either expressly or implicitly) to the defendant. *Doyle v. State*, 633 P.2d 306, 309–310 (Alaska App.1981), relying on *Hunter*, 590 P.2d at 897 n. 35.

■ Long argues that a police station is, almost by definition, "an oppressive and remote setting", and that therefore any interrogation conducted at a police station must ordinarily be preceded by *Miranda* warnings. This is certainly true when the defendant is brought to the station following his arrest, but questioning does not become custodial simply because it occurs at a police station. *California v. Beheler*,

463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1278 (1983).

Our supreme court recognized this same principle in *Henry v. State*, 621 P.2d 1 (Alaska 1980). Henry was a suspect in a burglary. The police affirmatively asked Henry to come to the station for an interview, and they transported him to this interview in a patrol car. The supreme court nevertheless upheld the trial court's decision that Henry had gone to the station of his own free will and, thus, the police had not been required to advise Henry of his *Miranda* rights. *Henry*, 621 P.2d at 2–4.

■ The crucial factual issue in Long's case is why he decided to accompany Bresette to the police station. Long testified that, when he told Bresette that he would rather wait until later to talk to the police, Bresette replied "that it was important, and we have to go to the station, so he's got to question me." This testimony portrays Bresette's "request" as a form of command. While Long's testimony during cross-examination tended to show the encounter in a different light, Long never explicitly receded from his initial description of Bresette's words or the tenor of the interaction between himself and Bresette at the construction site.

It is true that Long conceded several times that he was free to leave. However, it appears that Long was speaking from an existential viewpoint—that is, Long was referring primarily to his physical ability to leave. Each time, he qualified his statement by adding that he believed he would be in worse trouble if he exercised this physical power to break off questioning and leave the presence of the officers. If Long's initial description of his encounter with Bresette is accurate, we would rule that Long was in custody when he went to the police station.

As the finder of fact, Judge Jeffery was entitled to conclude that Long had exaggerated the coercive aspects of the encounter and that Bresette did not order Long to come to the station for questioning. However, Judge Jeffery did not directly address this issue in his findings at the conclusion of the hearing. Judge Jeffery found that

Long had decided to accompany Bresette to the police station and be questioned there. But Judge Jeffery failed to make findings regarding the specific, objective circumstances under which Long made his decision to accompany Bresette.

■■■■ Under the objective test adopted in *Hunter,* the issue of custody is not resolved by Judge Jeffery's finding that Long had subjectively believed himself free to disregard Bresette's wishes. Instead, the question is whether a *reasonable person in Long's position* would have felt free to choose whether or not to accompany Bresette.[1]

Resolution of this question depends to a large extent on precisely what Bresette said to Long. As noted above, Long testified that, when he asked Bresette if the interview could be postponed, Bresette answered, "it was important, and *we got to go to the station, so he's got to question me.*" If this is a true rendering of Bresette's words to Long, we believe that a reasonable person in Long's position would not have felt free to decline Bresette's "offer". As reported by Long, Bresette's statement amounts to an order for Long to accompany him to the station.

Judge Jeffery did not make any specific finding concerning precisely what Bresette told Long. However, Judge Jeffery never stated that he distrusted or rejected Long's characterization of this conversation. If Judge Jeffery accepted Long's report of his initial conversation with Bresette but nevertheless concluded that Long was not in custody for *Miranda* purposes even after receiving this command to accompany Bresette to the police station, then Judge Jeffery's conclusion would be clearly erroneous.

On the other hand, it is possible that Judge Jeffery, after evaluating the totality of Long's testimony and Long's credibility as a witness, concluded that Long had exaggerated or mischaracterized the tenor of that initial conversation with Bresette. If so, Judge Jeffery's finding that Long voluntarily accompanied Bresette to the police station would not be clearly erroneous.

Under Alaska Criminal Rule 12(d), a trial judge ruling on a suppression motion must explicitly state all findings of fact essential to a determination of the issues raised. Here, the determination of precisely what Bresette told Long appears to be crucial to the decision of whether or not Long was in custody for *Miranda* purposes. The superior court did not explicitly address this key issue of fact. Because of the resulting ambiguity of Judge Jeffery's ruling, and because Criminal Rule 12(d) requires explicit findings on essential factual issues, we believe it would be inappropriate here to apply the normal presumption that factual issues not specifically addressed by the trial court were resolved in the manner most favorable to upholding the trial court's ruling. *See Johnson v. State,* 631 P.2d 508, 513–14 (Alaska App.1981). We therefore find it necessary to remand this case for specific findings on this issue.

If Judge Jeffery concludes that Long exaggerated the coercive aspects of his initial encounter with Bresette at the construction site, so that Long was not in custody when he decided to accompany Bresette, we uphold Judge Jeffery's ruling that Long's subsequent interaction with the officers at the police station did not convert the interview into a custodial interrogation. Long was neither handcuffed nor frisked on the way to the station, and he rode in the front seat of the police car. Upon arrival, Long was questioned in the public area of the police station, a room that serves as both office and reception area. The two police officers sat behind a desk, while Long took a seat on the other side of the desk, toward the front door. From this position, the exit from the station was accessible to Long; this door was neither locked nor guarded. Moreover, the police station was only one-half block from

---

1. We note that, when judging custody under *Hunter,* we must examine whether the circumstances were impermissibly coercive from the point of view of a reasonable, *innocent* person. *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir.1988) (en banc); *United States v. Corral–Franco,* 848 F.2d 536, 543 (5th Cir.1988) (Hughes, J., dissenting); W. LaFave & J. Israel, *Criminal Procedure* (1984), § 6.6(c); Vol. 1, p. 493, n. 25.

Long's work and just as close to Long's house; he did not need police transportation to return to his job or to go home. Finally, Judge Jeffery found, from listening to the tape recording of the interview, that the tone of the questioning was low-key and that Long began to discuss the facts of the burglary after very little prompting. Judge Jeffery's findings with regard to this aspect of the case are not clearly erroneous.

Long's remaining arguments on appeal concern his motion to dismiss the grand jury indictment. Long's primary reason for seeking dismissal of the indictment is that the grand jury heard his statements to the Nuiqsut police. We have just held that the admissibility of these statements must be reconsidered.

■ Long, however, makes a second attack on the grand jury indictment which can be resolved in this appeal. Long argues that the indictment should be dismissed because Bresette, in his grand jury testimony, told the grand jurors that Long had committed another crime—that Long had slashed Bresette's tires. Judge Jeffery ruled that, while there had been no reason for Bresette to have mentioned this incident, the reference to this other crime was made in passing and could not have influenced the grand jury's decision. We agree. The grand jurors heard both Long's and Herman Oyagak's confessions to the burglary; the brief testimony about the tire slashing could not have affected the outcome of their deliberations on the burglary indictment.

We therefore AFFIRM the superior court's ruling on this aspect of Long's motion to dismiss the grand jury indictment. However, with respect to Long's motion to suppress his statements to the police, this case is REMANDED to the superior court for further proceedings. We do not retain jurisdiction.