STATE of Alaska, Petitioner,

v.

Robert E. MURRAY, Jr., Respondent.

No. A–3024.

Court of Appeals of Alaska.

Aug. 24, 1990.

Carmen E. Clark, Asst. Dist. Atty., James L. Hanley, Dist. Atty., Kenai, and Douglas B. Baily, Atty. Gen., Juneau, for petitioner.

William F. Morse, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for respondent.

Before BRYNER, C.J., and COATS and SINGLETON,* JJ.

## OPINION

BRYNER, Chief Judge.

Robert E. Murray, Jr., was indicted for sexual abuse of a minor and moved to suppress incriminating statements on the ground that they were the product of a custodial interrogation conducted without *Miranda* warnings. Superior Court Judge Charles K. Cranston granted the motion, and the state petitioned for review. We granted the petition and ordered briefing. We now reverse.

The underlying facts are undisputed. A few days before October 17, 1986, Alaska State Trooper John F. Adams telephoned Murray and spoke with him about allegations that Murray had sexually abused his wife's daughter. Adams said that he wanted to interview Murray at a later date. Murray agreed. On October 17, the trooper's dispatcher telephoned Murray, scheduled a time for Adams to contact him at home, and notified Adams. Adams drove his patrol car to Murray's house and parked in the driveway. Upon Adams' arrival, Murray, on his own initiative, came out of the house and entered the patrol car. He sat down in the front passenger seat and immediately began talking to Adams about the accusations. Murray was never physically restrained in any way as he sat in the car, and at no time did Adams make any show of force toward him.

After several minutes, Adams turned on his tape recorder. He did not turn it on sooner because Murray had caught him by surprise by coming out of the house, entering the patrol car, and immediately starting to talk. After starting the tape recorder, Adams told Murray that he was not going to arrest him. He said that he would send the recording of the interview to the district attorney, who would make the decision about any future action. Murray asked Adams if he should have an attorney. In response, Adams assured Murray that, if Murray wanted an attorney, Adams

would not pressure him to complete the interview but would "back off right now." Murray said that he did not feel guilty and did not want the situation "to go that far." He then described a sexual encounter that he had with the child six years previously. Murray talked to Adams for approximately twenty-five minutes. At the end of the interview, Murray left Adams' car and returned to his house. Adams drove away. As he had indicated to Murray he would do, Adams submitted the tape recorded interview to the district attorney's office. Two months later Murray was indicted.

Murray moved to suppress the interview, contending that his statements were made in a custodial setting and that he should therefore have been given *Miranda* warnings. After holding a suppression hearing at which Adams testified, Judge Cranston noted that the interview was conducted in a marked patrol car and that Adams indicated that the interview would stop if Murray wanted an attorney. Emphasizing "Adams" own perception of Murray's right to counsel," the court concluded that the interrogation was custodial and suppressed the evidence.

Custody exists when there are "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979), established the objective, reasonable person standard for determining whether a person is in custody. Courts are to examine three groups of facts to determine whether a reasonable person would feel free to leave and break off police questioning: "the manner and scope of the actual interrogation, events which took place before the interrogation, including those which explain how and why the defendant came to the place of questioning, and, where relevant, what happened after the interrogation." *Quick v. State,* 599 P.2d 712, 717 (Alaska 1979) (citing *Hunter,* 590

---

* This case was submitted for decision prior to    Judge Singleton's resignation.

P.2d at 895). Determination of custody is made on a case-by-case basis.

■ Having examined the record in light of the applicable standard, we conclude that the superior court was clearly erroneous in finding that a reasonable person in Murray's position would not have felt free to leave. Murray was invited to participate in the interview with Adams and agreed to do so several days before the interview took place. He had ample time to reconsider his initial decision if he desired to do so. Nevertheless, when contacted on the date of the interview, Murray agreed to a specific time to be interviewed. The interview took place at Murray's home. Although the interview occurred in Adams' patrol car, it was Murray who elected the precise location. Murray left his house on his own initiative and got into the car as soon as Adams drove into the driveway. He began speaking immediately upon sitting down in the car.

During the interview, Murray sat in the passenger seat of the car without being physically restrained in any way. Nothing in the record indicates that Adams used a show of force or any other coercive tactic. Adams expressly told Murray that he would not be arrested, a promise that he later kept. Adams also made it clear that any decision as to whether to prosecute would be made by the district attorney's office. When asked by Murray whether he thought Murray should get an attorney, Adams appears to have given a candid and straightforward answer: he told Murray that the decision was up to him. Adams advised Murray that he would terminate the interview immediately if Murray wished to consult with an attorney.

■ Judge Cranston apparently placed great weight on Adams' response, construing his willingness to terminate the interview if Murray wanted an attorney as an indication that Adams believed that Murray had a right to counsel. Judge Cranston apparently reasoned that if Adams believed Murray had a right to counsel, he must have believed that Murray was in custody.

In our view, however, Judge Cranston's emphasis on Adams' subjective perceptions was unwarranted. First, Adams' willingness to defer to Murray's desire to speak with an attorney could easily have been nothing more than a gesture of good will aimed at fostering Murray's trust and cooperation, rather than an expression of the trooper's subjective impression of Murray's custodial status. Nothing in Adams' testimony at the evidentiary hearing supports the conclusion that Adams believed Murray to be in custody or that his statement to Murray was prompted by such a belief. Indeed, by extension of the trial court's reasoning, it would make as much sense to conclude that Adams did not believe Murray was in custody, because, if he had, he would have given Murray the full *Miranda* warnings.

■ Second, under the objective standard adopted in *Hunter,* Adams' subjective perceptions were irrelevant to the issue of custody except to the extent that they were manifested in the form of conduct that a reasonable person would have construed as coercive. Here, as we have indicated, the only objective circumstance even remotely suggestive of custody was the fact that the interview occurred in Adams' patrol car. As we have also indicated, however, it was Murray himself who chose to speak with Adams in the patrol car.

Having carefully reviewed the totality of the record, we find no objective circumstances that could have reasonably led Murray to conclude that he was not free to terminate the interview and leave.[1] Ac-

---

1. Indeed, on appeal, Murray does not attempt to point out any specific circumstances that could have led a reasonable person to believe that the interview was custodial. Rather, he in effect argues for application of a somewhat different standard than the objective test established in *Hunter.* He contends that, for purposes of *Miranda* warnings, custody should be deemed to begin when the police begin to elicit incrimina- ting statements from the accused. Although Murray concedes that he was not in custody when he first entered the car, he argues that his situation became custodial after he first admitted having sexual contact with his wife's daughter. Murray's argument seems to be a variant of the long-rejected "focus of investigation" theory of custody. Murray cites five cases that he contends support his view. *See Hintz v. State,*

cordingly, the trial court was clearly erroneous in finding that Murray was in custody and that a *Miranda* warning was required.

The superior court's decision is RE-VERSED.

627 P.2d 207, 209 (Alaska 1981); *Henry v. State,* 621 P.2d 1, 3 (Alaska 1980); *LeMense v. State,* 754 P.2d 268, 274 (Alaska App.1988); *Ridgely v. State,* 705 P.2d 924, 929 (Alaska App.1985); *Pierce v. State,* 627 P.2d 211, 214, 216 (Alaska App.1981).

In each of these cases, however, the inception of custody was marked not by the utterance of an incriminating statement, but rather by some objective action taken by the officer. In each case, the officer's action was held to have altered the pre-existing situation so that a reasonable person in the defendant's position would no longer have felt free to leave.

In the present case, by contrast, Adams took no objective action manifesting the exercise of custody or restraint in response to any incriminating statement by Murray. Moreover, we do not believe that Adams' professed willingness to terminate the interview if Murray wanted to consult with an attorney could reasonably have been construed by Murray as a sign that he was in custody.