STATE of Alaska, Petitioner,

v.

**Ruple Marx SMITH, Respondent.**

No. S–9546.

Supreme Court of Alaska.

Jan. 11, 2002.

Eric A. Johnson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

Michael D. Dieni, Assistant Public Defender, Anchorage, and Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

During the investigation of a forcible rape, the police published an artist's sketch of the suspect. Ruple Marx Smith called the police, gave his name, and said that he looked like the police sketch of the suspect but was innocent. An officer visited Smith the next day and, during the course of an interview, Smith confessed. Contending that the interrogation was custodial, Smith moved to suppress his confession because the police failed to inform him of his *Miranda*[1] rights. The

trial court denied his motion, and a jury convicted him. The court of appeals reversed, concluding that Smith was in custody. Our independent review of the record leads us to conclude that a reasonable person in Smith's position would have felt free to break off the interview and leave. Accordingly, we reverse the decision of the court of appeals and reinstate Smith's conviction.

## II. *FACTS AND PROCEEDINGS*

On July 26, 1994 K.S. was raped by an unknown man. At the crime scene, the police found shoe prints and bicycle tire tracks near the spot K.S. had been attacked. The police determined that the bicycle "had different tires on the front and rear, both being very distinctive." Both were narrow street tires, but the tread on the front tire was wider and deeper than the rear tire.

K.S. was able to give a detailed description of her attacker, and a police artist prepared a composite sketch. K.S. also noticed that the man had been riding a blue ten-speed bike. K.S. ultimately picked Ruple Marx Smith out of two six-photo lineups.[2]

On July 28 the police published the composite sketch in a local newspaper. Around mid-morning, Smith called the police. He identified himself, indicated that two friends had told him that the sketch in the paper looked like him, and asked for a description of the suspect. Smith denied responsibility for the crime and claimed to have an alibi. The police officer taking the call thought it was suspicious and reported it to his supervisor.

The next day postal carrier Mike Wiles told Trooper Robert Clark that he thought a person resembling the sketch lived at the home of Larry and Margaret Dean. Trooper Clark visited the Dean residence and met Smith, who Clark thought looked like the sketch. Smith asked Clark if Clark thought that he looked like the sketch. Hoping not

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. When shown the first lineup of Department of Motor Vehicle photographs, K.S. initially indicated that the men pictured looked too young and clean-looking and that she was not sure. After a

police officer commented that the picture might show her attacker after a shave, shower, and haircut, K.S. chose Smith's picture. The second lineup included a picture of a different suspect but not Smith. K.S. indicated almost immediately that her attacker was not pictured.

to alert him to what he was doing, Trooper Clark said no. Trooper Clark was also suspicious about Smith's "over-friendly" manner.

Smith owned a blue ten-speed bicycle. Trooper Clark examined the tires and noticed the front and back tire treads differed from each other.

Trooper Clark reported his findings to Sergeant Robert Barnes. Later that same day, Sergeant Barnes and Trooper Clark went back to Smith's residence in separate patrol cars. Both were in uniform and armed. Barnes asked to speak to Smith about the incidents of July 26. Smith was friendly and, as found by the trial court, "more than willing" to talk to Barnes. Barnes told Smith it was easier to talk in his patrol car, and Smith agreed. The day was rather hot, and the air conditioning in Barnes's patrol car was on. Smith entered the front passenger side of the patrol car; Barnes sat next to him on the driver's side. The doors were not locked.

Barnes's tape recording of the interview began at 1:49 p.m. Barnes first told Smith that he was not under arrest and was free to leave. Smith indicated that he understood.

Barnes began the questioning by asking why Smith had called the police the day before. Smith initially claimed that he was with friends the morning of K.S.'s attack. Barnes's questioning became more accusatory. When Barnes first confronted Smith with the evidence that the bicycle tire tracks at the crime scene matched his bicycle tires and that the victim identified him from a photo lineup, Smith denied any connection. After Smith denied Barnes's accusation a second time, Smith's friend, Dave, walked up outside the car, and Smith called loudly to greet him. Barnes mentioned the evidence against Smith a third time, adding comments like "tell me the truth," "and I'm not gonna arrest you," and "it's kinda obvious that you were involved." Smith became less responsive. After Barnes repeated the allegations a fourth time, Smith made incriminating responses.

After this point of the interview, Smith apparently asked for an attorney.[3] Barnes said that he would not arrest Smith. Smith left the patrol car and talked to his friends, Larry Dean and Dave Smith, who were standing nearby in the driveway. The entire interview in the police car lasted thirty minutes.

Barnes stayed on the scene until around 3:00 p.m. He taped an additional short exchange between himself and Smith in which Smith offered to get the clothes that he wore on the day of the crime. Smith indicated that he was very tired and wanted to get back to bed as soon as he could.[4]

Trooper Clark remained on the premises with Smith. He did not restrain or control Smith; Smith went into both his apartment and the Deans's house. Barnes returned less than two hours later and arrested Smith.

Smith filed a motion to suppress his statements made in the interview, alleging that his Fifth Amendment rights were violated by Barnes's failure to give him *Miranda* warnings before his custodial interrogation. Superior Court Judge Charles K. Cranston denied Smith's motion and issued findings of fact to support his ruling. At trial, a jury convicted Smith of kidnaping, sexual assault, and sexual abuse of a minor.

Smith appealed. A divided court of appeals[5] found that Smith had been in *Miranda* custody from the time that Sergeant Barnes told Smith, "And what I need to do is, is, have you tell me the truth. And I'm not gonna arrest you." The court of appeals remanded for the trial court to determine whether the introduction of Smith's confession was harmless error. On remand, the trial court found that the error was not harmless. Accordingly, the court of appeals reversed Smith's convictions. The state appeals on the sole issue of whether Smith was in *Miranda* custody during his questioning in Sergeant Barnes's patrol car.

---

**3.** Barnes testified that he accidentally taped over this part of the interview.

**4.** Smith later testified that he had worked a twelve-hour graveyard shift the night before.

**5.** Judge David Mannheimer dissented.

## III. STANDARD OF REVIEW

■ In *Thompson v. Keohane*, the United States Supreme Court held that whether the facts as determined by the trial court lead to the conclusion that the defendant is in custody for *Miranda* purposes "presents a mixed question of law and fact qualifying for independent review." [6] While the Supreme Court's decision was made in the context of *habeas corpus* review, its rationale is applicable here. The Court reasoned that policies of providing guidance on legal principles, unifying precedent, and stabilizing the law supported *de novo* review.[7] The United States Supreme Court adopted the same approach in *Ornelas v. United States*, holding that *de novo* was the proper standard of review for a determination whether the facts found by the trial court constitute probable cause.[8] We previously found this reasoning persuasive in ruling that *de novo* review was proper for a determination of probable cause in a child-in-need-of-aid case.[9] In this parallel situation, we likewise adopt *Thompson*'s rationale and apply *de novo* review to the ultimate *Miranda* custody determination on direct appeal.

■ We accept the trial court's factual findings except when clearly erroneous.[10] In the absence of findings as to disputed factual issues, we view the evidence in the light most favorable to the party prevailing at the trial level—here, the state.[11]

## IV. DISCUSSION

The state argues on appeal that the court of appeals erred in two ways: (1) by failing to view evidence in the light most favorable to the prevailing party in the absence of findings as to disputed issues, and (2) by determining that Smith was in custody for *Miranda* purposes.

### A. The Court of Appeals Correctly Viewed Evidence in the Light Most Favorable to the Prevailing Party in the Absence of Findings as to Disputed Factual Issues.

The state contends that the court of appeals erred by failing to view evidence in the light most favorable to the prevailing party "in the absence of findings as to disputed issues." Smith notes that the state misquoted the standard of review—the appellate court must view evidence most favorable to the prevailing party in the absence of "findings as to disputed *factual* issues."

Possibly because of the quotation error, the state interprets appellate deference to the trial court too broadly. The state specifically argues that the court of appeals should have adopted an interpretation of what Sergeant Barnes said that was most favorable to the state.

■ The state fails to distinguish between the fact itself and the application of the law to the fact. In the absence of express findings, the appellate court must resolve disputed factual issues in favor of the prevailing party, but it is under no such requirement when applying the law to the facts. For example, what Barnes actually said in the interview is a fact. Although the superior court made no express finding, an appellate court should accept the transcript of the interview as an accurate record of what was actually said, unless clearly erroneous. How a reasonable person would interpret a statement in that transcript, however, is a mixed question of law and fact—an application of the law to the fact of what was said.[12] It is not simply a disputed fact that must be construed in the state's favor. Thus, the court of appeals correctly applied its independent judgment to determine how a

---

6. 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

7. *See id.* at 115, 116 S.Ct. 457.

8. 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

9. *See Matter of J.A.*, 962 P.2d 173, 175 n. 1 (Alaska 1998).

10. *See Gallmeyer v. State*, 640 P.2d 837, 839 (Alaska App.1982).

11. *See id.*

12. *See Thompson*, 516 U.S. at 112–13, 116 S.Ct. 457.

reasonable person would interpret Sergeant Barnes's statement.

B. *The Court of Appeals Erred in Determining that Smith Was in Custody for Miranda Purposes.*

[W]ithout proper safeguards the process of in custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.[13]

 The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [14] Two discrete inquiries are essential to the determination of custody: (1) the circumstances surrounding the interrogation; and (2) given the totality of those circumstances, whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.[15] In the first step, the court generally defers to the factual findings of the trial court. Once the facts are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": whether there was a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." [16]

In the present case, the superior court's factual findings are not in dispute. Thus, the

sole inquiry before us is whether, in the totality of the circumstances, Smith was in *Miranda* custody.

 To determine whether "a reasonable person would feel he was not free to leave and break off police questioning," we have noted that facts pertaining to events before the interrogation, facts intrinsic to the interrogation, and facts about events after the interrogation are relevant.[17] Specific facts include:

1. Preinterrogation events, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers;

2. The circumstances of the interrogation, including:

 • when and where it occurred

 • how long it lasted

 • how many police were present

 • what the officers and the defendant said and did

 • the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door

 • whether the defendant was being questioned as a suspect or as a witness;

3. Postinterrogation events, especially what happened after the interrogation—whether the defendant left freely, was detained, or was arrested.[18]

No single factor is dispositive; we consider the totality of the circumstances in each case.[19] "The custody determination must be

---

**13.** *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**14.** *Id.* at 444, 86 S.Ct. 1602; *see also Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (stating that duty to give *Miranda* warnings is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody' " (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977))).

**15.** *See Thompson,* 516 U.S. at 112, 116 S.Ct. 457.

**16.** *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711).

**17.** *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979).

**18.** *See id.*

**19.** *See Carr v. State,* 840 P.2d 1000, 1003 (Alaska App.1992).

made on a case-by-case basis."[20]

### 1. *Preinterrogation events*

The state argues that Smith initiated contact with the police, attempted to mislead them with a fabricated alibi, and prior to the interview remained eager to discuss the matter. Smith responds that he did not contact the police on the day of the questioning and did not intend to mislead the police with an alibi.

The court of appeals has ruled that a suspect's initiation of contact with police weighed against the conclusion of custody.[21] Smith appears to argue that because his initial telephone call to the police is unlike the facts of existing case law where a suspect's participation indicated non-custodial interrogation, his initial telephone call is insignificant to the determination of *Miranda* custody.

The facts here are different from the existing precedent. However, while the interview may have been less custodial if the police had scheduled it in advance, the fact remains that Smith contacted the police first. While he may not have initiated contact on the day he was questioned, Smith gives no convincing reason why the police's next-day response should erase the import of his initial action. In addition, during the call, Smith identified himself to police, and the police asked Smith for his address and telephone number. Under these circumstances, a reasonable person would not have been surprised when the police later visited him to follow up.

As a factual matter, Smith denies the state's allegation that he attempted to mislead police. He notes that the officer who took Smith's call did not state in his own words that Smith had offered an alibi. The only testimony supporting the allegation that Smith attempted to mislead the police with an alibi came on cross-examination by the defendant's attorney, where the trooper answered "yes" to a compound question asking whether Smith had said "he didn't do it," "wanted to clear it up," and "could tell [police] where he was all day."

What Smith actually said to the police in his initial telephone call is the sort of disputed fact, in the absence of an express finding, that an appellate court should resolve in favor of the prevailing party.[22] The trial court made no express finding of the content of Smith's call to police. For the purposes of this review, then, Smith did offer his alibi, which may be construed as an attempt to mislead police.

■ Courts generally do not suppress un-Mirandized, self-incriminating statements made in attempts to mislead police.[23] The reasoning is that the suspect had "considered the risk of self-incrimination and deemed it to be less important than the possibility of clearing himself."[24] In *Hunter v. State*, the defendant submitted to a lie detector test, hoping to beat the test and end suspicion.[25] We noted that the attempt to mislead police supported the conclusion that his interrogation was non-custodial.[26]

Smith contends that *Hunter* should be distinguished on its facts. While the facts of *Hunter* differ, the general rule and its supporting rationale apply equally. Although not as egregiously as Hunter, Smith did attempt to mislead police.

Finally, it is undisputed that just prior to the interview, "Smith was friendly and was

---

**20.** *Hunter*, 590 P.2d at 895.

**21.** *See Beltz v. State,* 895 P.2d 513, 515, 520 (Alaska App.1995) (concluding that interview was noncustodial when defendant initiated the interview by walking into a police station without prior appointment and asking to "talk to someone about sex abuse"); *State v. Murray,* 796 P.2d 849, 851 (Alaska App.1990) (concluding that interview was noncustodial when police made an appointment to meet with defendant and defendant, on his own initiative, came out of his house, sat down in the patrol car, and immediately began talking about the accusations).

**22.** *See supra* part IV.A.; *Gallmeyer v. State,* 640 P.2d 837, 839 (Alaska App.1982).

**23.** *See Hunter,* 590 P.2d at 899 n. 39.

**24.** *Id.* (quoting Jefferson V. Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?,* 25 S.C. L.Rev. 699, 725 (1974)).

**25.** *Id.* at 899.

**26.** *See id.* at 899 n. 39.

more than willing to talk to Barnes." When Barnes asked to speak to Smith and suggested that it was easier to talk in the patrol car, Smith agreed. Smith walked to the patrol car and entered it voluntarily.

Smith's initial call to police, his attempt to mislead police, and his voluntary agreement to questioning in the police car weigh against a conclusion of custody.

2. *Circumstances intrinsic to the interrogation*

a. *When and where it occurred*

The state argues that the location of the interview in Sergeant Barnes's patrol car "is not dispositive, or even particularly interesting." Smith responds that the police car was a police-dominated environment.

 There are literally dozens of cases where a court was asked to determine whether a suspect was in *Miranda* custody when the facts included questioning in a police car.[27] The most that can be determined from these cases is that an interview in a police car is not determinative of *Miranda* custody.[28]

While questioning in a police car is more custodial than in one's home, it is generally less custodial than questioning at the police station. Courts have noted that the custodial atmosphere is further diluted when questioning in a police car is otherwise objectively reasonable. For example in *Hintz v. State*, we noted that it was reasonable to have the suspect sit in the front seat of the police car when the weather was about ten degrees below zero.[29] Recently in *Blank v. State*, the court of appeals affirmed the trial court's conclusion that there was no *Miranda* custody in part because the police car was "an alternative private location." [30] In *Blank*,

the police officer told the suspect that the interview was conducted in the police car only for the sake of convenience and expressed concerns about talking in front of the suspect's children.[31]

In the instant case, both rationales exist. The trial court found that the day was rather hot and that the police car's air conditioning was on. In addition, holding the interview in the police car is justified by the need for privacy. As Judge Mannheimer noted in dissent, a reasonable person "would have perceived the patrol car [in the person's driveway] as a suitable place for a private conversation" about the rape of a minor. Plus, the eventual presence of Larry Dean and Dave Smith validates the concern for privacy.

Smith argues that the police could have questioned him in the equally private confines of his apartment. This is true. Taking into account these competing considerations, questioning in the police car favors a conclusion of custody but only minimally.

 Concerning when the interview occurred, Smith argues that the time of the interview was coercive because he had worked a twelve-hour graveyard shift the night before and was very tired. However, the timing of the interview is far more determinative when the interview begins at an unreasonable time. This is not the 4 a.m. interrogation found to be custodial in *Orozco v. Texas*.[32] The interview started at 1:49 p.m. Because we consider whether a reasonable person would think he was free to leave, the reasonable time of day of the interview favors a conclusion of no custody.

b. *How long it lasted*

Smith candidly admits that "[t]he relevant part of the interview was relatively short, 30

---

**27.** *See* J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v[.] Arizona Requiring That Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation*, 31 A.L.R.3d 565, 625–29 (1970 & Supp.2000).

**28.** *See, e.g., State v. Murray*, 796 P.2d 849, 851 (Alaska App.1990) (reversing trial court determination that interview in police car was custodial); *State v. Preston*, 411 A.2d 402, 405 (Me.1980)

(affirming trial court's determination that interview in police car was custodial).

**29.** 627 P.2d 207, 209 (Alaska 1981).

**30.** 3 P.3d 359, 363 (Alaska App.2000).

**31.** *See id.* at 362.

**32.** 394 U.S. 324, 325, 327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

minutes long." This fact favors a conclusion of no custody.[33]

#### c. *How many police present*

The parties do not dispute that two officers were present at Smith's apartment. Only Sergeant Barnes, however, conducted the interview in the patrol car. Trooper Clark was standing outside the car in the shade, out of direct view. Thus, this fact favors a conclusion of no custody.

#### d. *What Sergeant Barnes and Smith said and did*

The state and Smith raise numerous points concerning what Sergeant Barnes and Smith said and did during the interview: the overall tone of the interview, Barnes's initial assurances that Smith was not under arrest and was free to leave, the meaning of the actual words used by Barnes, Smith's greeting of his friend, Smith's request for an attorney, and Smith's statement that he wanted to get back to bed. Both sides interpret each point in their favor.

The state argues that the questioning started casually and that Sergeant Barnes's tone was calm and low-key throughout the interview. Smith admits that Sergeant Barnes's voice was calm but argues that "the psychological tone of the interview changed radically" when the questioning became accusatory. This is the point where the court of appeals ordered suppression, after Sergeant Barnes said, "And what I need to do is, is, have you tell me the truth. And I'm not gonna arrest you."

Smith argues that the psychological tone changed radically at this point, but it did not. We have reviewed the tape recording of the interview. While Sergeant Barnes did accuse Smith of the crime and noted the evidence against Smith, this was not the first time that Barnes had accused Smith; Barnes had done so twice previously.[34] In addition, Barnes's demeanor remained calm and his tone of voice was, in the words of Judge Mannheimer, with which we agree, "sympathetic—almost apologetic." The overall tone is noncustodial.[35]

At the inception of the interview, Sergeant Barnes told Smith that he was not under arrest and was free to leave at any time. Smith argues that Sergeant Barnes did not tell Smith that he could remain silent and did not repeat the warnings as the questioning became accusatory.

■ Assurances from the police that a person is not under arrest and is free to leave generally indicate a lack of custody but are not conclusive.[36] While multiple assurances would have made this case easier to decide,[37] the initial assurances tended to make a reasonable person believe he was not in custody.

The state and Smith interpret Barnes's statements to Smith differently. Both agree that Barnes said, "And what I need to do is, is, have you tell me the truth. And I'm not gonna arrest you." The state argues that the last sentence was a reassurance that Smith was not under arrest. Smith argues that the connecting "and" starting the second sentence made the assurance of not being under arrest conditional on Smith telling the truth. The state responds that use of "and" was simply a colloquialism.

The statement is somewhat ambiguous. Ignoring contextual pauses and word usage,

---

**33.** *See State v. Murray,* 796 P.2d 849, 850 (Alaska App.1990) (concluding no *Miranda* custody for interview that, among other things, lasted only twenty-five minutes); *State v. Gard,* 358 N.W.2d 463, 465–67 (Minn.App.1984) (thirty minutes).

**34.** The fact that Smith was accusatorially questioned as a suspect is a separate factor. *See infra* part IV.B.1.f.

**35.** *See Long v. State,* 837 P.2d 737, 740 (Alaska App.1992) (noting that a factor in finding no *Miranda* custody was that "the tone of the interview had been low-key, not heavy-handed").

**36.** *See Long,* 837 P.2d at 741 ("Even when a suspect is assured that he is not under arrest, the circumstances of his contact with the police may belie this assurance and convince the suspect that he indeed is in police custody."); *Hampel v. State,* 706 P.2d 1173, 1178–79 (Alaska App.1985).

**37.** *See Thompson v. State,* 768 P.2d 127, 131 (Alaska App.1989) (dicta noting numerous assurances and concluding no custody).

one could infer a conditional offer—if Smith told the truth, Barnes would not arrest him.[38] However, Barnes said "and" instead of "if"; the literal meaning of Barnes's words was not a conditional offer. Furthermore, a reasonable person would interpret Sergeant Barnes's statement in context. Barnes used "and" to start his sentences at least twenty-one times in the short interview. Also, Barnes paused about two seconds between the two sentences. Given this context, we interpret Barnes's use of "and" as simply colloquial.

The state notes that Smith called to his friend "Dave" during the interview while in the police car. The state argues that this shows Smith was comfortable and not coerced. Smith argues that his friend apparently did not hear him, which heightened the incommunicado aspects of the interview. While Smith's call to his friend might show his relative comfort in the police interview, his action is equally indicative of a nervous person trying to change the subject. Concerning Smith's argument, Dave's lack of audible response to Smith's salutation does not indicate the heightened coerciveness of the interview; if anything, Dave's appearance—and the fact that Dave appeared to have remained nearby because he spoke with Smith immediately after the interview—diluted any atmosphere of police domination.

The state and Smith also draw opposite interpretations from Smith's request to speak to a lawyer. The state argues that his request shows he knew he could terminate the interview. Smith argues that it shows he felt he was under arrest and needed a lawyer. Both contentions are plausible.

The state also highlights Smith's later statement: "I'd like to get to bed as soon as I can [because] I'm tired." The state argues that if Smith thought he was free to go back to bed, he must have thought he was free to go. Smith argues that his statement only indicates his hope that he would be free to go

back to bed. Although Smith does not note it in his brief, he also said something that suggested he did not feel free to leave: "Well you wanna walk over there with me Trooper Clark?" Both of these points have reasonable interpretations for and against custody. Thus, neither would be decisive to a reasonable person.

In sum, the tone of the interview, Barnes's assurance that Smith was free to leave at any time, and the presence of Smith's friends indicate a non-custodial interview.

> e. *Presence of actual physical restraint or equivalents such as drawn gun or guard at door*

The police did not physically restrain Smith during the interview. Sergeant Barnes did not seize him and walk him to the car. Nor was Smith handcuffed. The doors of the patrol car were not locked. Both Sergeant Barnes and Trooper Clark were in uniform and armed.

■■■ Smith argues that he thought he was locked in the police car. In addition, Smith may have thought Clark was outside guarding against his escape. The defendant's subjective belief of custody is not controlling,[39] but it is a factor in the totality insofar as it may reflect a reasonable person's understanding. The weight of this factor is dependent upon Smith's credibility. In the absence of a trial court finding that Smith actually thought he was locked in the police car,[40] we conclude that this factor indicates custody only slightly.

> f. *Whether Smith was questioned as a suspect or witness*

■■■ Smith notes that he was questioned not only as a suspect, but as the guilty party. Barnes put four confrontational questions to Smith. "[A] reasonable person would conclude he was in custody if the interrogation is close and persistent, involving leading ques-

---

**38.** Even assuming that a reasonable person would interpret Sergeant Barnes's statements as a conditional offer is problematic. Would a reasonable innocent person believe that, if he falsely confessed to a crime, the police would not arrest him and he would be free to leave?

**39.** *See Hunter v. State*, 590 P.2d 888, 894–95 (Alaska 1979).

**40.** Judge Cranston denied Smith's motion to suppress, which suggests that Judge Cranston would not have found that Smith thought he was locked in the police car.

tions and the discounting of the suspect's denials of involvement." [41] Barnes's accusations make the interview seem custodial.

The state counters that accusatory questioning simply shows that police have focused suspicion on the suspect, and both the United States Supreme Court and this court have rejected the "focus of suspicion" test as the test for custody. It is true that both courts have rejected the police's subjective focus of suspicion as the sole factor in determining custody.[42] However, the police's subjective focus, when made clear to the suspect in an objective manner like accusatory questioning, is still a relevant factor.[43] Thus, the fact that Sergeant Barnes asked multiple accusatory questions does weigh in favor of a conclusion of custody.

### 3. *Post-interview events*

The focus of the post-interview events factor is whether the suspect was arrested, detained, or left free. The state argues that Smith was not arrested immediately. Smith argues that even if he was not arrested immediately, at least one, and sometimes two, police officers stayed with him and that he was arrested about one and one-half hours after the interview.

▇▇▇ The post-interview events factor is of limited weight. In *Hunter*, we noted that the post-interview events factor

cannot by itself be the determinative test for custody. The police might be willing to release a suspect after custodial interrogation, especially if the release permitted them to introduce statements that might otherwise be excluded for lack of *Miranda* warnings. Also, a court must determine whether the defendant was in custody when he made the incriminating statements; it is illogical to rest that judgment primarily on something that occurs after the defendant has made the statements.[44]

The state argues that the police only need go through the fiction of releasing the suspect to impart the feeling that the suspect is free to leave. Sound public policy contradicts giving the police incentive to delay arrests just to work a fiction of non-custodial interrogation. Thus, this factor's slight weight favors a conclusion of custody because the police remained with Smith until he was arrested less than two hours later.

### 4. *The totality of the circumstances*

▇▇▇ Having looked at each factor in relative isolation, we now consider whether, in the totality, the circumstances are "such that a reasonable person would feel he was not free to leave and break off police questioning."[45] The totality of the circumstances indicates a non-custodial interview. Smith's initial telephone call to police to give an alibi, his voluntary agreement to talk in Barnes's patrol car, the mid-afternoon timing of the interview, its brief thirty minute duration, the questioning by a single police officer, the tone of the interview, the presence of Smith's friends, and Barnes's assurance that Smith was free to leave support the conclusion of non-custodial interrogation.

On the other hand, Barnes's use of accusatory questioning strongly indicates custody. Added to this are the facts that the interview occurred in a police car, and that Smith was arrested soon after the interview. While these facts make the question closer, we conclude that the interview was not custodial—a reasonable person would have felt free to leave.

Although each case is distinguishable on one or more facts, other cases can help to flesh out the reasonable person standard. Within Alaska jurisprudence, the closest cases are *Tagala v. State*,[46] *State v. Mur-*

---

**41.** 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(f), at 540 (2d ed.1999).

**42.** *See Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Hunter*, 590 P.2d at 895.

**43.** *See State v. Murray*, 796 P.2d 849, 851–52 n. 1 (Alaska App.1990); *Hunter*, 590 P.2d at 893.

**44.** *Hunter*, 590 P.2d at 895 n. 23.

**45.** *Id.* at 895.

**46.** 812 P.2d 604 (Alaska App.1991).

ray,[47] and *Motta v. State*.[48]

In *Tagala*, the court of appeals affirmed the trial court's determination that Tagala was not in *Miranda* custody.[49] At least three police officers stopped and frisked Tagala but did not arrest him. They asked Tagala to come to the police station to answer some questions, and he agreed. Tagala rode in the front seat of the police car without restraint. He entered the police station and interview room himself. At the start of the interview, police told Tagala he was not under arrest and was free to leave. The interview lasted less than two hours. After the interview, police dropped Tagala at a friend's house but kept him under surveillance. Police arrested him later that day after a second interview.[50]

The primary differences between *Tagala* and the instant case include: the police did not appear to use accusatory questioning, Tagala did not call police initially, and the interview was held at the police station and lasted longer. The additional intimidation of the interview at the police station and the longer duration of the interview offsets the lack of accusatory questioning. On the whole, the important facts of *Tagala*, similar to the instant case, indicate that Smith, like Tagala, was not in *Miranda* custody.

In *Murray*, the court of appeals found that Murray was not in *Miranda* custody when the interview occurred in the front seat of a police car in the driveway of his home, Murray entered the car voluntarily, the police officer told Murray that he would not be arrested, and the interview lasted about twenty-five minutes.[51] The differences with this case are: the officer did not use accusatory questioning—Murray "began speaking immediately upon sitting down in the car," the police initiated contact but scheduled a meeting time, and Murray was not arrested until two months after the interview.[52] The

most significant difference is accusatory questioning; if Sergeant Barnes had not confronted Smith with the evidence against him in this case, *Murray* would counsel that there was no *Miranda* custody.

In *Motta*, the court of appeals held that Motta's interrogation initially was non-custodial but ripened into *Miranda* custody.[53] Two police officers contacted Motta at his home and asked him to come to the police station for an interview. Motta drove to the police station in his own car. The police told him that he was not trapped there, that the door was closed for privacy, and that they wanted any statement he made to be voluntary. The interview started in a non-accusatory manner, but the two officers later confronted Motta with evidence against him. Motta was told to tell the truth.[54] At one point, Motta was told to "just sit tight, relax" and stay in the room while both officers left.[55] Later, when Motta asked to go to his car for his cigarettes, the officers did not allow him to leave the room and instead went to get the cigarettes for him. After a little more than three hours of interrogation, Motta confessed. After he confessed, the officers told a surprised Motta that he was not under arrest and free to leave. The police kept Motta under surveillance and arrested him two hours later.[56]

The primary differences between *Motta* and the instant case are that the interrogation occurred at the police station and the police did not allow Motta to leave after the interview. Also missing are the additional factors of a second interviewing police officer and a longer duration.

Out-of-state precedent similarly fails to provide an exact factual match. The closest cases with police car interrogations are de-

47. 796 P.2d 849 (Alaska App.1990).

48. 911 P.2d 34 (Alaska App.1996).

49. *See Tagala*, 812 P.2d at 609.

50. *See id.* at 606–07.

51. *See Murray*, 796 P.2d at 850–51.

52. *Id.* at 850.

53. *See Motta*, 911 P.2d at 39.

54. *See id.* at 36–37.

55. *Id.*

56. *See id.* at 37–38.

cided both ways.[57]

Our conclusion that Smith's interview was non-custodial does not conflict with *Miranda*'s basic purposes.[58] In *Miranda*, the Warren Court attempted to combat the evils of police custodial interrogation: physical coercion and violence, police deceit, suspects' ignorance of their rights, mental coercion, secrecy, incommunicado pressures, the incorrect belief that silence will incriminate, and the toll on individual liberty.[59] The instant interview bears little resemblance to this kind of interrogation. The only substantial concern here is the psychological pressure of Barnes's accusatory questioning, but the other facts minimize this concern. The police were not physically threatening. Sergeant Barnes's statement of the evidence against Smith was not deceitful. Smith was not ignorant of his rights: Barnes told Smith that he was free to leave at any time, and Smith eventually ended the interview by asking to speak to a lawyer. The tape recording remedied the concerns with secret interrogation. The incommunicado aspects of an interview in a police car in a suspect's driveway with friends present outside is minimal. Smith's voluntary, thirty-minute, police car interview was not coercive, was not custodial, and did not warrant a prophylactic *Miranda* warning.

## V. CONCLUSION

We conclude in the totality of the circumstances that Smith's interview was non-custodial. Accordingly, we REVERSE the decision of the court of appeals and REINSTATE Smith's conviction.

BRYNER, Justice, not participating.

MATTHEWS, Justice, dissents.

The question presented is whether a reasonable person in Smith's position would have believed before he confessed that he was free to terminate the questioning by Trooper Barnes and either leave or ask the police to leave.[1] If the answer to this question is yes then Smith was not in custody and no *Miranda* warning was required, but if the answer is no a warning was required. I agree with the court of appeals that the answer is no.

Smith was being questioned about a crime that was not only serious, but notorious and frightening to the community. A fourteen-year-old girl had been dragged off a bike path and raped. In the close confines of a

---

57. *Compare State v. Gard,* 358 N.W.2d 463, 465–67 (Minn.App.1984) (concluding no *Miranda* custody where officer was not in uniform, questioned suspect in the front seat of an unlocked unmarked car outside of suspect's work, told suspect he was not under arrest and free to leave at any time, talked to suspect for thirty minutes, allowed suspect to return to work, and arrested suspect more than a month later), *and State v. Travis,* 250 Or. 213, 441 P.2d 597, 598–99 (1968) (concluding no *Miranda* custody where officer chose to have interview in his police car, told suspect that he had a right to an attorney, did not tell suspect he had a right to remain silent, confronted suspect with victim's identification of him, allowed the suspect to go free after he promptly confessed, and arrested suspect the following day), *with In re N.E.R.,* 159 Ill.App.3d 320, 111 Ill.Dec. 228, 512 N.E.2d 132, 133–35 (1987) (concluding that trial court's determination of no *Miranda* custody was contrary to the manifest weight of evidence where suspect was fifteen years old and officer asked suspect to talk in police car for privacy's sake, talked to suspect in unmarked car in front of suspect's home, did not recall touching suspect as he entered the front seat of the car, may have locked the door but was not certain, used accusatory questioning for about two hours, never told suspect he was free to leave, and told suspect he was not under arrest at the end of the interview), *and State v. Preston,* 411 A.2d 402, 404–06 (Me.1980) (concluding sufficient evidence supported presiding justice's finding of *Miranda* custody where police had search warrant for suspect's home, questioned suspect in a police car near the suspect's home, used no physical restraint, told suspect that he was free to leave and did not have to talk, and used accusatory questioning).

58. *See Beckwith v. United States,* 425 U.S. 341, 345–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (stating that "an extension of the *Miranda* requirements [to include non-custodial interrogation] would cut this Court's holding in that case completely loose from its own explicitly stated rationale").

59. *See Miranda v. Arizona,* 384 U.S. 436, 446–56, 467–68, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

1. *See Long v. State,* 837 P.2d 737, 740 (Alaska App.1992) ("[U]nder the circumstances of the police interaction with the suspect, would a reasonable person have felt free to break off the interrogation and, depending on the location, either leave or ask the police to leave?").

patrol car, Trooper Barnes made it clear that he knew that Smith was the rapist. He described the strong evidence against Smith. The victim had identified Smith in a photo lineup, and bicycle tracks at the scene matched the unique set of tires on Smith's bicycle. After hearing this, given the serious and notorious nature of the crime, I do not believe that a reasonable person in Smith's position would believe that he would be allowed to remain at large. And, as this case illustrates, a reasonable person would be right in that belief, for Smith was under continuous and overt police surveillance from the end of the interview until he was formally arrested two hours later.

Trooper Barnes told Smith in sequence, "[I]t's kinda obvious that you were involved in this. OK. And what I need to do is, is, have you tell me the truth. And I'm not gonna arrest you." How would these statements be understood by a reasonable person in Smith's position? In the context of Barnes's expressed belief that Smith was "involved," the request that Smith tell the truth is obviously a request for a confession. What then to make of the statement that Smith would not be arrested? The state argues that Barnes was not telling Smith that if he confessed he would not be arrested. Instead, according to the state, Barnes was promising freedom from arrest no matter what Smith said.[2]

Accepting this interpretation simply illustrates that the promise not to arrest was not reasonably believable. The state would have us believe that Trooper Barnes meant—and a reasonable person would understand him to mean—that Smith would not be arrested even if he confessed that he was the rapist the police sought. In my opinion, no reasonable person could believe this.[3]

A truly knowledgeable person would realize that the purpose of the assurance of no arrest was to avoid the need to give a *Miranda* warning, and that it was untrue. Less knowledgeable but reasonable people might not know the purpose of the assurance, but they would realize that it was probably not true. A policeman who had just recited persuasive evidence showing that a suspect was guilty of a serious crime and who then told the suspect that he was obviously guilty would be unlikely to set the suspect free.

Trooper Barnes quietly, skillfully, and repeatedly insisted that Smith confess.[4] He said nothing after he laid out the evidence and declared his belief in Smith's guilt that would cause a reasonable person to believe that Smith still had freedom of action. For these reasons I would affirm the decision of the court of appeals.

---

**2.** According to the state, "Barnes's remarks could reasonably be construed as providing *unconditional reassurance* that Smith would not be arrested."

**3.** I believe the majority opinion agrees with this point. It states, "Would a reasonable innocent person believe that, if he falsely confessed to a crime, the police would not arrest him and he would be free to leave?" Op. at 1158, note 38. A guilty person would have even less reason to believe that he could remain at large if he confessed.

**4.** For example, chronologically: "And what I need to do is, is, have you tell me the truth." "Well I can't, can't stress to you Ruple how important it is that ah, you tell us the truth and you tell us the truth right away." "Right, right from the beginning on this Ruple." "So I need to have your side of the story Ruple and and, cause I, I'm sure that, that, some of the things you told me, aren't exactly what happened."