Darren SHAY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10380.

Court of Appeals of Alaska.

July 1, 2011.

Margi Mock, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

The police found Darren Shay hitchhiking about a mile from the site of a car crash following a high-speed chase. Shay gave vague statements when questioned about his whereabouts at the time of the crash, and the police eventually arrested him and gave him a *Miranda* warning. The trial court denied Shay's motion to suppress his pre-*Miranda* statements to police. We agree with the trial court that Shay was initially subjected to an investigatory stop that did not involve custodial interrogation, and therefore his pre-arrest statements were admissible.

### Background

Alaska State Trooper Levi Duell pulled a green sedan over around Mile 103 of the Sterling Highway. Duell began to approach the car on foot, but the car then sped off. The trooper initially followed the car, but then discontinued the chase when he reached an unsafe speed. A short time later, the trooper observed the green sedan abandoned in the ditch at Mile 107.

Duell and Soldotna Police Officer Jared Meyer searched the woods around the abandoned car, assuming that the driver had escaped on foot. After a fruitless search, Meyer headed north back toward Soldotna and came across Shay standing on the side of the road, about one mile north of where the green sedan went into the ditch. Meyer stopped to talk to Shay to see if he knew anything about the chase or the abandoned

car. When talking to Shay, Meyer noticed that Shay was dirty and wet and looked like he had been outside for a while.

Meyer contacted Duell, and asked the dispatcher to run Shay's name through the computer. The dispatcher told Meyer that Shay was on felony probation for driving under the influence. Shay admitted that he was on probation and cooperated when Meyer asked him to provide a breath sample. The portable breath test indicated that Shay had consumed alcohol.

Meyer asked Shay where he had come from, and Shay replied that he had been at a friend's house nearby. The entire conversation, though not recorded, was apparently cordial. Shay was never handcuffed or physically restrained in any way, and he was cooperative throughout.

About five minutes after Meyer first contacted Shay, Duell arrived on the scene. This portion of the investigation was recorded. Duell performed a brief pat-down for weapons, and Meyer asked Shay to take a seat on the bumper of his police vehicle. Duell then asked Shay where he was coming from, and Shay replied that he had been at his friend Mike Whitehousen's place nearby. Shay did not know Whitehousen's phone number or the name of the road on which he lived. Dispatch reported that the computer database revealed nobody by that name.

Shay then explained that he was out burning brush with Whitehousen. He did not know the names of any of the other people who were burning brush. He said that he left when they started drinking because of his probation conditions.

Shay asked what he had done to draw this kind of police attention, and Duell explained that they were looking for someone who fled from police following a car chase. Shay responded that he didn't drive.

At this point, Duell put Shay in the back seat of his police vehicle. After a brief discussion about the name of Shay's probation officer, Shay asked Duell if he was under arrest. The trooper responded that he was not under arrest, but he was in custody, and then the trooper recited the *Miranda* warning. Duell then asked Shay to direct him to the burn site in order to corroborate Shay's story. But when they got to the location Shay described, there was no sign of a fire.

Further investigation revealed that the green sedan was owned by Shay's coworker and that another coworker had asked to borrow it the day before. Later, Shay's roommate contacted Duell and told him that she had been in the car and that Shay was driving the car when they fled from the police. Shay was charged with failing to stop for a peace officer[1] and two counts of third-degree assault for recklessly placing Shay's roommate in fear of imminent physical injury and for causing her actual physical injury.[2]

Shay filed a motion to suppress his statements to the police, arguing that the police subjected him to a custodial interrogation but did not advise him of his *Miranda* rights.[3] Superior Court Judge Carl Bauman denied Shay's motion to suppress, ruling that the custodial interrogation did not begin until Shay was placed in the police vehicle. Shay was convicted after a jury trial, and he now appeals.

### Discussion

During a custodial interrogation, a suspect must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[4] The defendant may then waive these rights and speak with the police.[5] If a suspect is subjected to custodial interrogation without first receiving these warnings, his statements may not be used against him.[6] We examine two issues to determine whether an interrogation was custodial: "(1) the circumstances

---

1. AS 28.35.182(a)(1), (3).

2. AS 11.41.220(a)(1)(A), (B).

3. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. *Id.*

5. *Id.*

6. *Id.*

surrounding the interrogation; and (2) given the totality of those circumstances, whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."[7]

We accept the trial court's factual findings regarding the circumstances of the interrogation unless they are clearly erroneous.[8] Using the trial court's factual findings, we independently decide the question of whether the suspect was in custody.[9]

■ Shay argues that he could have reasonably assumed that Officer Meyer had placed him under arrest for a probation violation. He argues that "[d]ispatch reported that Shay was on felony probation for DUI, and his probation was conditioned upon not drinking alcohol." Shay did not make this argument in his motion to suppress, so the superior court did not make any findings on this issue.

■ In the absence of lower court findings on disputed issues, we view the record in the light most favorable to the lower court's ruling.[10] Here, the record does not support Shay's assertion. Meyer did testify that dispatch informed him that Shay was on probation. But the officer only assumed from this information that Shay had a probation condition requiring him not to drink alcohol to excess. He asked Shay if he had been drinking more than he was allowed to, and then asked him to take a portable breath test. But Meyer did not take any further action on this issue; in particular, he did not restrain Shay in any way.

Shay also argues that he was in custody when he made his statement to Trooper Duell. Duell began with a brief pat-down for weapons. Duell then began asking Shay

questions about why he was walking alone on the side of the road in a rural area in early winter, why he was dirty and with whom he had been socializing. Shay's answers were vague and noncommittal. The entire length of Shay's pre-*Miranda* contact with Duell was about thirteen minutes.

Shay argues that Meyer placed him in custody when the officer told Shay to "have a seat" on the bumper (while Duell was asking questions), thereby directing Shay to a physical location. He argues that a reasonable person would not have felt free to leave after receiving this direction.

The superior court assumed that the restrictions on Shay's movement could constitute a seizure under the Fourth Amendment—a seizure that had to be supported by reasonable suspicion.[11] But this observation does not establish that Shay was in custody for *Miranda* purposes. In *Berkemer v. McCarty*, the United States Supreme Court held that a person who is subjected to a traffic stop is not necessarily entitled to *Miranda* warnings, even if they do not reasonably believe that they are free to leave.[12]

■ This court has extended the *Berkemer* rationale to other types of investigatory stops. Investigatory stops are generally temporary and brief, and they generally take place in public, where the suspect is not subjected to the coercive pressures and isolation of a custodial interrogation.[13] A suspect is not entitled to a *Miranda* warning during an investigatory stop, unless they are "detained under circumstances substantially more coercive than the typical traffic stop, and that coercion actually impairs the free exercise of the privilege against self-incrimination."[14]

7. *State v. Smith*, 38 P.3d 1149, 1154 (Alaska 2002).

8. *Id.* at 1153.

9. *Id.*

10. *Id.*

11. *See generally Majaev v. State*, 223 P.3d 629, 632 (Alaska 2010) (indicating that, if a seizure occurs that triggers constitutional protections, "the next inquiry is whether the investigatory stop falls within the 'reasonable suspicion excep-

tion to the probable cause requirement.' " (quoting *Waring v. State*, 670 P.2d 357, 363 (Alaska 1983))).

12. 468 U.S. 420, 436–37, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

13. *Blake v. State*, 763 P.2d 511, 514 (Alaska App. 1988).

14. *Id.* at 515.

So, in *Blake v. State,* we held that *Miranda* warnings were not required when a trooper stopped a suspect to question him about shooting a bear.[15] In *McCollum v. State,* we held that no *Miranda* warnings were required when a trooper stopped a suspect in a parking lot and required him to sit in a patrol car while the trooper questioned him about damaging shopping carts.[16] And in *McNeill v. State,* we held that warnings were not required when a trooper came into a suspect's home to question him about a domestic disturbance.[17]

Shay's contact with the police appears to be a routine investigative stop like these reported decisions. Judge Bauman found that Duell had reasonable suspicion to justify questioning Shay—he was dirty and wet and hitchhiking in a rural area just a mile from the scene of a high-speed chase. And Trooper Duell's questioning of Shay took place on the side of a public road, with only one other officer present, under circumstances that were far different than the coercive atmosphere of a police station.

Shay also notes that when Duell eventually placed him in his vehicle, Duell instructed the dispatcher to notify Shay's probation officer that "he was holding Shay." This conversation allegedly occurred immediately before Duell gave Shay his *Miranda* warnings. Again, the record does not support Shay's argument. Duell did ask dispatch to contact Shay's probation officer, but he did not ask the dispatcher to tell the probation officer that he was holding Shay. Shortly thereafter, Duell told Shay that he was not under arrest. Thus the record suggests that Duell was not contacting Shay's probation officer to report that he *had* arrested Shay for a probation violation; he was contacting the officer to ask whether he *should* arrest him.

In any event, all of the statements in dispute were made before Shay was placed in the patrol car. During this time, the circumstances of Shay's detention were not more coercive than the investigative stops in *Blake, McCollum,* and *McNeill.* Duell never asked accusatory questions, never confronted Shay with incriminating evidence, and never pressured him in any way. He simply tried to clarify Shay's alibi. When the trooper was satisfied that Shay's alibi was likely false, he put him in the police vehicle and gave him a *Miranda* warning. We conclude that these circumstances did not constitute custodial interrogation.

### Conclusion

We AFFIRM the trial court judgment.

---

15. *Id.* at 512, 514–15.

16. 808 P.2d 268, 269–70 (Alaska App.1991).

17. 984 P.2d 5, 6–7 (Alaska App.1999).